## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

NATIONAL ASSOCIATION OF HOME )
BUILDERS, )
1201 15th Street, N.W. )
Washington, D.C. 20005 )
 )
  and )  No. _____
 )
SOUTHERN ARIZONA HOME )
BUILDERS ASSOCIATION, )
2840 North Country Club Rd. )
Suite 100 )
Tucson, AZ 85716 )
 )
  and )  **COMPLAINT**
 )
HOME BUILDERS ASSOCIATION )
OF CENTRAL ARIZONA, )
7720 North 16th Street )
Suite 310 )
Phoenix AZ 85020 )
    Plaintiffs, )
 )
    v. )
 )
LISA P. JACKSON, )
In her official capacity as the Administrator )
of the U.S. Environmental Protection Agency, )
Ariel Rios Building )
1200 Pennsylvania Avenue, N.W. )
Washington, D.C. 20460 )
 )
  and )
 )
U.S. ENVIRONMENTAL PROTECTION )
AGENCY, )
Ariel Rios Building )
1200 Pennsylvania Avenue, N.W. )
Washington, D.C. 20460 )
 )
  and )

LT. GEN.THOMAS P. BOSTICK,                          )
In his official capacity as Commanding              )
General of the U.S. Army Corps of Engineers,        )
441 G Street N.W.                                   )
Washington, DC 20314                                )
                                                    )
        and                                         )
                                                    )
U.S. ARMY CORPS OF ENGINEERS,                       )
441 G Street, N.W.                                  )
Washington, D.C. 20314                              )
                                                    )
                Defendants.                         )
_____ )

Plaintiffs, for their Complaint, allege as follows:

## NATURE OF THE ACTION AND PLAINTIFFS' CLAIMS

1.      Plaintiffs National Association of Home Builders, Southern Arizona Home
Builders Association, and Home Builders Association of Central Arizona (collectively "Home
Builders") bring this action on their own behalf and on behalf of their members under the judicial
review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., to
declare unlawful and set aside decisions of the U.S. Environmental Protection Agency ("EPA")
and the U.S. Army Corps of Engineers ("Corps") declaring that portions of the Santa Cruz River
are traditional navigable waters.

2.      The first decision was issued on May 23, 2008, by Colonel Thomas H. Magness,
United States Army, acting as the Commander of the Corps' Los Angeles District.  In that
decision, the Corps determined that two reaches of the Santa Cruz River, Study Reach A from
the Tubac gage station to the Continental gage station, and Study Reach B from the Roger Road
wastewater treatment plant to the Pima/Pinal County line, are traditional navigable waters.
Following a period of suspension and review by EPA headquarters, on December 3, 2008,

Benjamin H. Grumbles, EPA's Assistant Administrator for Water, affirmed Colonel Magness' decision and instructed EPA Region 9 (which includes Arizona) to begin immediately to implement this decision in all future agency actions in the Santa Cruz River watershed.  Copies of the Defendants' decisions are attached as Exhibits 1 and 2 and are incorporated herein by reference.  They are collectively referred to hereinafter as the TNW Rule.

3.      As more particularly alleged below, the Defendants' TNW Rule was issued for the purpose of allowing the agencies to assert jurisdiction over desert washes, arroyos and other drainage features within the Santa Cruz River watershed under the Clean Water Act, 33 U.S.C. §§ 1251 to 1387.

4.      The TNW Rule was issued without notice to the regulated community and an opportunity to comment, in violation of the APA.  Furthermore, the TNW Rule is substantively defective because the portions of the Santa Cruz River classified as traditional navigable waters in the TNW Rule are not navigable-in-fact waterways.

5.      The test for determining whether a body of water is navigable in the traditional sense, and therefore subject to Congress' Commerce Clause authority, is whether the water body is used, or is capable of being used, as a highway for waterborne interstate commerce.  In the seminal case on navigability, *The Daniel Ball*, 77 U.S. 557, 563 (1870), the Supreme Court held:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact.  And they are navigable in fact when they are used, or are susceptible of being used in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.  And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the states, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water.

Subsequent decisions of the Supreme Court have refined this test, but it has remained largely unchanged for 140 years. *See*, *e.g.*, *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 405-08 (1940).

6.     Defendants' TNW Rule has significant legal consequences and adversely affects Home Builders' members, as more particularly alleged below.

7.     Section 404 of the Clean Water Act, 33 U.S.C. § 1344(a), authorizes the Corps to regulate and issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." "Navigable waters" under the Clean Water Act are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). By rule, the Corps has defined the term "waters of the United States" broadly to include "tributaries" of navigable waters and wetlands "adjacent" to such tributaries. 33 C.F.R. § 328.3(a)(5) & (7). EPA's regulations contain a virtually identical definition of the term "waters of the United States." 40 C.F.R. § 230.3(s).

8.     In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court addressed the requirements for the Corps to assert jurisdiction over tributaries of navigable waters and wetlands adjacent to such tributaries under the Clean Water Act. A plurality of the Justices held that wetlands must be adjacent to "a relatively permanent body of water connected to traditional interstate navigable waters" and possess "a continuous surface connection with that water" to be subject to regulation. *Id.* at 742. Justice Kennedy, in his concurring opinion, stated that the Corps' jurisdiction over wetlands adjacent to a tributary depends on the agency's ability to demonstrate "a *significant nexus* with navigable-in-fact waters," not simply a remote hydrologic connection. *Id.* at 784-85 (emphasis added).

9.      The plurality opinion and Justice Kennedy's concurring opinion cited *The Daniel Ball* and *Appalachian Electric Power* in discussing what constitutes traditional navigable waters. *See Rapanos*, 547 U.S. at 723, 734, 760-61, 778; *see also Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) (the term "navigable" in the Clean Water Act refers to Congress' "traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made," citing *Appalachian Electric Power*). Therefore, Study Reaches A and B of the Santa Cruz River declared "navigable" by the Defendants in the TNW Rule must meet the criteria established in those cases.

10.     Defendants' TNW Rule was adopted shortly after *Rapanos* was decided for the purpose of classifying substantial portions of the Santa Cruz River as navigable-in-fact.  At the time the TNW Rule was issued, the nearest traditional navigable water to the Santa Cruz River was the Colorado River, which is some 300 river miles away.  Attached hereto as Exhibit 3 is a map that depicts the approximate locations of the segments of the Santa Cruz River declared "navigable" by the Defendants and their relationship to the Colorado River.  As shown on Exhibit 3, there is no continuous surface connection between the Santa Cruz River and the Colorado River.

11.     The TNW Rule altered the "significant nexus" analysis employed in determining the agencies' regulatory jurisdiction and authority in the Santa Cruz River watershed.  By classifying Study Reaches A and B of the Santa Cruz River as traditional navigable waters, the agencies extended the scope of their CWA jurisdiction to ephemeral washes, arroyos and other tributary drainage features in the Santa Cruz River watershed that would not and do not otherwise qualify as "the waters of the United States."

12.     The Corps and EPA are bound by and rely upon the TNW Rule in making site- and project-specific jurisdictional determinations and other permitting and enforcement decisions under the Clean Water Act in the Santa Cruz River watershed, which contains roughly 8,600 square miles (5.5 million acres) in southern Arizona, including the Tucson metropolitan area. The TNW Rule also will impact and affect permitting decisions by other agencies and/or governmental entities under the Clean Water Act, including stormwater permits issued by the Arizona Department of Environmental Quality under the Arizona Pollutant Discharge Elimination System ("AZPDES") program, a state program developed under Section 402 of the Clean Water Act.

13.     Home Builders' members own and use land within the Santa Cruz River watershed in connection with home building and other land development activities.  The TNW Rule directly and adversely affects the use of real property, investment decisions and project development choices of Home Builders' members by extending Clean Water Act jurisdiction to remote tributaries and ephemeral drainage features based on their relationship to the segments of the Santa Cruz River declared to be traditional navigable waters.

14.     As alleged below, the TNW Rule constitutes a legislative rule that was adopted without observance of the APA's procedures for rulemaking, including public notice and an opportunity to submit evidence and comments.  Therefore, the TNW Rule was adopted without observance of the procedures required by law, is in excess of Defendants' statutory authority, and is otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C) & (D).

15.     As alleged below, the TNW Rule is substantively defective because it is unsupported by credible evidence demonstrating that the Santa Cruz River is currently, or ever was, susceptible to use as a highway for water-borne interstate commerce under *The Daniel Ball*

and subsequent Supreme Court navigability cases.  Therefore, the TNW Rule is in excess of

Defendants' statutory authority, and is arbitrary, capricious, or otherwise not in accordance with

law.  5 U.S.C. § 706(2)(A) & (C).

## JURISDICTION AND VENUE

16.    Judicial review by this Court is authorized by the APA, 5 U.S.C. §§ 702, 704 and

706.  This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the claims

asserted arise under the laws of the United States.  The relief requested is authorized by the APA,

5 U.S.C. § 706, by 28 U.S.C. § 2201 and Federal Rule Civil Procedure 57 (declaratory relief).

17.    Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because

the EPA and the Corps are headquartered in this district, because the EPA's decision affirming

the TNW Rule and directing that it be implemented was made by senior agency officials in this

district, and because plaintiff National Association of Home Builders resides in this district.

## THE PARTIES AND PLAINTIFFS' STANDING

18.    Plaintiff National Association of Home Builders ("NAHB") is a national trade

association incorporated in the State of Nevada with its headquarters in Washington, D.C.

Founded in 1942, NAHB is a federation of more than 800 state and local associations located in

all 50 states.  About one-third of NAHB's more than 140,000 members are home builders and/or

remodelers.  The remaining members are associates working in closely-related fields within the

housing industry, such as mortgage finance and building products and services.   NAHB

represents its members in legal, regulatory, and legislative matters affecting the use and

development of their land.  Many of NAHB's members rely on it to effectively advocate on their

behalf concerning national issues.  It is germane to NAHB's organizational purpose to ensure

that its members can use their property to the fullest extent allowed by law so that they may build

and supply housing for all people throughout the United States regardless of income level, race, or nationality.  NAHB has expended significant resources to ensure that its members understand, and that the government agencies that regulate those members faithfully execute the goals and requirements of the Clean Water Act.

19.     NAHB's organizational policy currently provides that the Corps and EPA should consider "'navigability' to be the guiding factor in jurisdictional decisions."  It has long been central to NAHB's mission to ensure that the Corps and EPA make decisions on the Clean Water Act's scope that are consistent with congressional intent, tied to (but not coextensive with) traditional notions of navigability, and understandable to the regulated community and agency officials who administer and enforce the Clean Water Act.

20.     In advancing these associational policies and objectives, NAHB has advocated on Capitol Hill, to the Corps and the EPA, and in the courts for decisions and policies that clarify the Clean Water Act's jurisdictional reach.  Its advocacy efforts in this regard have commonly sought clarity and transparency in ascertaining what water features the Corps and the EPA deem traditional navigable waters.  Independent of this lawsuit, NAHB has spent considerable staff time and monetary resources to clarify Clean Water Act jurisdiction for the benefit of its members.

21.     Plaintiff Southern Arizona Home Builders Association ("SAHBA") is a non-profit corporation organized under the laws of the State of Arizona and headquartered in Tucson. SAHBA was formed in 1953 to provide a vehicle for businesses in the housing and building trades industries in southern Arizona (including Pima, Cochise and Santa Cruz Counties) to address issues and concerns relating to those industries.  SAHBA presently has approximately 350 member firms, which include real estate developers, home builders, contractors, consultants,

title insurance companies and other businesses in southern Arizona involved in and dependent on the home building industry.  SAHBA provides assistance to its members, as well as the building industry in general, by providing information, meeting with legislators and agencies, drafting and commenting on legislation and agency rules and, when necessary, participating in litigation in federal and state courts.  SAHBA is an affiliate of NAHB, and members of SAHBA are also members of NAHB.

22.     Plaintiff Home Builders Association of Central Arizona ("HBACA") is a non-profit corporation organized under the laws of the State of Arizona and was formed in 1951 to provide a unified voice on issues affecting the housing and building industry in central Arizona, including Maricopa and Pinal Counties.  HBACA presently has approximately 480 members, including home builders, real estate developers, contractors and other businesses involved in the home building industry in central Arizona.  HBACA serves as a forum through which its members can work together to remain informed regarding new and proposed policies advanced by the local, state and federal governments that affect the housing industry.  It also acts as a source of timely and reliable information concerning the state of the local building industry and works to eliminate overly restrictive and costly building laws and regulations that inflate the cost of housing.  Like NAHB, HBACA represents its members in legal, regulatory, and legislative matters affecting the use and development of their land, including matters arising under the Clean Water Act, and it participated in the *Rapanos* litigation as *amicus curiae*.  NAHB membership has indicated that NAHB's advocacy efforts are of primary importance to membership.  HBACA is an affiliate of NAHB, and members of HBACA are also members of NAHB.

23.     The TNW Rule has injured and will continue to injure Home Builders and their

members.   Such injuries are concrete and particularized and are actual or imminent, not conjectural or hypothetical.   Furthermore, such injuries are fairly traceable to Defendants' unlawful action and will be redressed by the relief sought herein.

24.   Home Builders have members that own and use land within the 8,600-square mile Santa Cruz River watershed, which is generally depicted on Exhibit 3, including land that contains streams, washes, arroyos and other watercourses and drainage features that are tributary to the Santa Cruz River.   Attached as Exhibits 4 and 5 are maps that depict the locations of Study Reaches A and B of the Santa Cruz River determined to be traditional navigable waters in the TNW Rule and the numerous tributaries to the Santa Cruz River, based on USGS maps and data.

25.   As more particularly alleged below, the Defendants' TNW Rule was issued for the purpose of asserting jurisdiction over and regulating desert washes, arroyos and other ephemeral drainage features in the Santa Cruz River watershed, which includes the metropolitan Tucson area – the second most populated area in Arizona.   *See* Exhibits 3 and 5, attached hereto. Thus, Home Builders' members and their land use activities are the objects of and are adversely affected by the challenged government action.

26.   By expanding Clean Water Act jurisdiction within the Santa Cruz River watershed, the Defendants' TNW Rule has affected and will continue to directly affect the investment and project development activities of Home Builders' members in southern Arizona.

27.   Many of Home Builders' members in southern Arizona are homebuilders and real estate developers.   In connection with developing and improving their land, Home Builders' members regularly construct streets and roads, install utility lines and related improvements, and grade and improve lots and other parcels of private land.   In many cases, these activities cannot be conducted without impacting desert washes and other drainage features, which are common

throughout the Sonoran desert and are found on many parcels of land within the Santa Cruz River watershed, including land owned by Home Builders' members.  *See* Exhibits 4 and 5, attached hereto.   In addition, it is the position of EPA that stormwater emanating from construction sites and discharged to waters of the United States constitutes a point source discharge regulated under the Clean Water Act.  For construction projects, it is often impossible to construct a project in a manner that avoids these discharges.  Compliance with Clean Water Act stormwater permit requirements is burdensome, expensive and time consuming.

28.     The Defendants'  TNW Rule has dramatically altered the manner in which Clean Water Act jurisdiction is determined in the Santa Cruz River watershed, and burdens Home Builders' members by determining the issue of the nearest traditional navigable water.  Under the TNW Rule,  Home Builders' members are now prevented from demonstrating that there is no significant nexus (and therefore no jurisdiction) between desert washes and other drainage features in the Santa Cruz River watershed and the Colorado River – the nearest traditional navigable water prior to adoption of the TNW Rule.  Home Builders' members now have the choice of applying for a permit for activities that are outside the scope of the agencies' authority under the Clean Water Act or facing significant civil or criminal enforcement penalties for failing to do so.

29.     When the Corps asserts jurisdiction over a watercourse, such as a desert wash, the landowner must obtain a permit from the Corps under Section 404 of the Clean Water Act prior to conducting any land use activities that may result in a discharge of materials in to the watercourse.  In many cases, obtaining such permits causes project delays and increased costs which may impair the project's viability, especially given the current state of the real estate market in southern Arizona.  Consequently, the additional burden caused by the Defendants'

TNW Rule is substantial and injures Home Builders' members.  For example, the plurality

opinion in *Rapanos* explained:

> The average applicant for an individual permit spends 788 days
> and $271,596 in completing the process, and the average applicant
> for a nationwide permit spends 313 days and $28,915-not counting
> costs of mitigation or design changes. ... [O]ver $1.7 billion is
> spent each year by the private and public sectors obtaining
> wetlands permits. ... These costs cannot be avoided, because the
> Clean Water Act impose[s] criminal liability, as well as steep civil
> fines, on a broad range of ordinary industrial and commercial
> activities. ... In this litigation, for example, for backfilling his own
> wet fields, Mr. Rapanos faced 63 months in prison and hundreds of
> thousands of dollars in criminal and civil fines.

*Rapanos*, 547 U.S. at 721 (quotation marks and citations omitted).

30.    The Corps advises the public that developing their land without obtaining a

Section 404 permit may have serious legal consequences.  For example, the Corps' website

states:  "Performing unauthorized work in waters of the United States … can have serious

consequences.  You would be in violation of federal law and could face stiff penalties, including

fines and/or requirements to restore the area.…  Enforcement is an important part of the Corps

regulatory program.  Corps surveillance and monitoring activities are often aided by various

agencies, groups, and individuals, who report suspected violations.  When in doubt as to whether

a planned activity needs a permit, contact the nearest district regulatory office.  It could save a lot

of unnecessary trouble later."  Regulatory Program Frequently Asked Questions, available at

http://www.usace.army.mil/Missions/CivilWorks/RegulatoryProgramandPermits/FrequentlyAsk

edQuestions.aspx (visited Oct. 30, 2012).

31.    Home Builders and their members, as members of the regulated community, have

a direct and substantial interest in the manner in which the Clean Water Act Section 404 program

is administered by Defendants.  As alleged above, many of Home Builders' members have or

will attempt to obtain permits under Section 404 that authorize discharges of fill materials into

waters subject to regulation under the Clean Water Act in connection with their projects.  Home Builders and their members, as representatives of the regulated community, have an interest in the manner in which such regulation takes place, including the types of watercourses that are subject to the agencies' regulatory jurisdiction and the administrative procedures followed by Defendants in declaring bodies of water to be navigable-in-fact.

32.     Many of Home Builders' members who operate in the Santa Cruz watershed disturb more than one acre of land (or less when part of a common plan of development) during their homebuilding and land development activities.  If the storm water runoff from these activities enters a jurisdictional watercourse, these members must comply with Clean Water Act Section 402 and the AZPDES program.  Home Builders' members commonly comply with the CWA and AZPDES program by operating under *AZPDES General Permit for Discharges From Construction Activities to Water of the United States* (AZG2008-001).  The AZPDES General Permit places restrictions on the manner in which Homer Builders' members operate their construction sites and discharge their storm water, and increases their costs.

33.     An AZPDES permit is required for any point source discharge of pollutants to a water of the United States.  As a result, the TNW Rule for the Santa Cruz River watershed will impact the interests of Home Builders' members relating to activities in the Santa Cruz River watershed and permitting requirements under section 402 of the CWA and the AZPDES General Permit program.

34.     Home Builders have suffered actual and concrete injuries in their own right, insofar as their advocacy functions have been impinged.  One of Home Builders' central functions is to provide regulatory assistance and compliance advice to its members, including the scope of federal regulatory jurisdiction under the Clean Water Act.  In this case, and unsolicited

by any formal request for comments from the public, Home Builders submitted a detailed letter and background materials to the Corps after learning of the Corps decision, which was ignored by the agencies.

35.     As regular participants in rulemakings and other administrative proceedings under the Clean Water Act, Home Builders and their members have a right, protected by the APA, to fair and open decision-making by the Corps and EPA.   This right is germane to their organizational purposes, which includes advocating for clarity and transparency in the agencies' regulation under the Clean Water Act.  Further, Home Builders' members, who own land within the Santa Cruz River watershed and frequently require Clean Water Act permits, also have a right to fair decision-making under the APA.  These rights are protected by the APA, and they have been impaired by the Defendants' failure to observe procedural requirements mandated by the APA in adopting the TNW Rule.  Furthermore, by failing to follow the procedures required by the APA, the agencies have impeded Home Builders' ability to advocate on behalf of their members and impaired the Home Builders' members' right to fair decision-making.

36.     The nature of the claim for relief sought does not necessitate the participation of an injured member for proper resolution of the suit.  Home Builders' legal challenges to the TNW Rule are facial.  The TNW Rule was adopted on a stand-alone basis, based on the characteristics of the Santa Cruz River and without any pretense of complying with the APA's rulemaking requirements.  Therefore, the Defendants' TNW Rule is based on its own factual record, and its validity will depend on that record.

37.     The relief being sought is a declaration regarding the validity of the Defendants' TNW Rule and that rule's classification of Study Reaches A and B of the Santa Cruz River as navigable-in-fact waterways.   Home Builders do not seek any damages or other monetary

compensation for the Defendants' unlawful conduct.  Home Builders instead request that the TNW Rule be vacated and set aside pursuant to 5 U.S.C. § 706.  This relief does not require that any individual organization members be joined as parties.

38.     Defendant Lisa P. Jackson is the EPA Administrator, and is sued in her official capacity.  Among her various responsibilities, Defendant Jackson is responsible for the EPA's administration of the Clean Water Act and its various regulatory programs, including the Section 404 regulatory program.

39.     Defendant EPA is a federal agency charged with carrying out certain obligations under the Clean Water Act.  Pursuant to an agreement between EPA and the Corps, EPA claims to be the ultimate authority under the Clean Water Act (as between the agencies) to determine the geographic scope of section 404 waters of the United States.  *See Memorandum of Agreement Between the Department of the Army/Environmental Protection Agency Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program and the Application of the Exemptions under Section 404(f) of the Clean Water Act* (Rev. Jan. 1993) ("Geographic Jurisdiction Memorandum") at § I (Purpose and Scope).  EPA has adopted regulations that define the term "the waters of the United States" and certain other terms relating to the geographic scope of its jurisdiction, which are codified at 40 C.F.R. Part 230.  EPA's Acting Assistant Administrator of Water, acting on behalf of the agency, issued EPA's December 3, 2008, decision affirming Colonel Magness' decision and directing that the TNW Rule be applied in all future agency actions in the Santa Cruz River watershed.

40.     Defendant Lieutenant General Thomas P. Bostick is the Corps' Commanding General and Chief of Engineers, and is sued in his official capacity.   Among his various

responsibilities, Lieutenant General Bostick is responsible for the Corps' administration of the Clean Water Act Section 404 regulatory program.

41.     Defendant Corps is a federal agency charged with carrying out certain obligations under the Clean Water Act, including the issuance of permits authorizing the discharge of dredged and fill materials into navigable waters under Section 404.  The Corps has adopted regulations that define the term "the waters of the United States" and certain other terms relating to the geographic scope of its jurisdiction, which are codified at 33 C.F.R. Parts 328 and 329. Colonel Thomas H. Magness, acting in his official capacity as the Commander of the Corps' Los Angeles District, issued the Corps' May 23, 2008 decision classifying portions of the Santa Cruz River as traditional navigable waters.

## ALLEGATIONS CONCERNING THE SANTA CRUZ RIVER

42.     The Santa Cruz River has its headwaters at the southern base of the Canalo Hills in Santa Cruz County, Arizona, and flows generally south as a shallow perennial stream through the San Rafael Valley before crossing into Mexico near the town of Loquiel, Arizona.  The river then loops through a small portion of the Mexican State of Sonora before reentering the United States approximately six miles east of Nogales, Arizona.

43.     The Santa Cruz River continues northward from the international boundary with Mexico past the communities of Rio Rico, Tubac, Green Valley, and Sahuarita to Tucson, and then in a northwesterly direction through the Tucson metropolitan area and into southern Pinal County, where the channel enters an area called the Santa Cruz Flats, which is a broad plain of indistinct non-continuous channels.  *See* Exhibit 3, attached hereto.

44.     From the 1800s to present day, the Santa Cruz River has been a discontinuous stream, normally flowing only in response to significant precipitation events and discharges of sewage effluent.

45.     The two reaches of the river that have been classified as traditional navigable waters in the TNW Rule are called "Study Reach A" and "Study Reach B."

46.     Study Reach A is located south of Tucson, in Pima County, Arizona.  It begins at the U.S. Geological Survey ("USGS") gage station near Tubac, Arizona, and ends at the USGS gage station near Continental, Arizona, a distance of approximately 20 miles.  Its location is shown in Exhibits 3 and 4, attached hereto.  By most historical accounts, the Santa Cruz River was ephemeral or intermittent in this area with limited surface flows.

47.     At present, the northern (downstream) portion of Study Reach A has no water flow for most of the year, and Study Reach A's base flow consists of sewage effluent.

48.     Study Reach B begins at the discharge outfall of Pima County's Roger Road wastewater treatment plant in northwestern Tucson, Arizona, and ends at the Pima County-Pinal County border in Arizona, a distance of approximately 30 miles.  Its location is shown in Exhibits 3 and 5, attached hereto.  Historically, this reach was ephemeral or, at best, intermittent.

49.     At present, Study Reach B has no natural flow for much of the year, and its base flows are primarily sewage effluent.

50.     The ordinary flow of water in Study Reaches A and B is insufficient for the Santa Cruz River to be used as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

51.     At best, Study Reaches A and B are capable of supporting a canoe during exceptional periods of high water.  Even then, these flows are of extremely limited duration.  For

example, on August 9, 2006, flows at Tubac, Arizona (within Study Reach A) reached 175 cubic

feet per second ("cfs").  The next day, the maximum flow peaked at 9.8 cfs.  Flows at Tubac

only reached 63 cfs or higher 23 times in 2006.  Excluding these "flashy" flows, the mean daily

average was 10.7 cfs at this gage in 2006.  To put this in context, the average daily mean flow in

Rock Creek, at the USGS gage located in Rock Creek Park, in Washington D.C., is 33 cfs.

52.     The gage station at Continental, Arizona, where Study Reach A terminates, was

dry more than 80 percent of the time over a forty-six-year record.

53.     The base flow in Study Reach A is regulated sewage effluent discharged from the

Nogales International Wastewater Treatment Plant ("NIWTP"), which is located near Rio Rico,

Arizona, approximately 10 miles south (upstream) of the Tubac gage station.

54.     The NIWTP discharges between 8.8 million gallons per day ("mgd") and 16.0

mgd of sewage effluent into the Santa Cruz River.  In the absence of "flashy" flow conditions,

the volume of effluent discharged from the NIWTP directly correlates with the base flow at the

Tubac gage station.  Upon information and belief, the NIWTP is under no obligation to continue

discharging effluent in to the Santa Cruz River, and could cease these discharges at its discretion.

55.     Base flows in Study Reach B are similarly dominated by sewage effluent.  Pima

County operates and maintains two Tucson metropolitan area wastewater treatment facilities,

which are located near the Santa Cruz River at Roger Road and Ina Road.

56.     The combined treatment capacity of Pima County's two facilities is

approximately 78 mgd, and they collectively discharged over 52,000 acre-feet of effluent directly

into the river in 2007.  Upon information and belief, Pima County is under no obligation to

continue discharging effluent in to the Santa Cruz River, and could cease these discharges at its

discretion.

57.     As a consequence, most of the base flow at the Trico Road gage station, located in the northern (downstream) portion of Study Reach B, consists of effluent discharged from the Ina Road sewer plant, which is located 17.6 miles upstream.

### THE AGENCIES' RULEMAKING PROCESS

58.     As alleged above, there are two agency decisions that collectively comprise the TNW Rule.  The first decision was issued by Colonel Thomas H. Magness, the Commander of the Corps' Los Angeles District, on May 23, 2008.  That decision, which is attached as Exhibit 2, declared that Study Reaches A and B are "navigable-in-fact" and thus are traditional navigable waters or "TNWs."

59.     Colonel Magness specifically determined:

> Public access points within of [sic] the Study Reaches such as low river banks, bridges, and trail systems, together with their physical characteristics, such as frequency, duration, and permanency of flow, indicate that the Study Reaches have the potential to be used for commercial recreational navigation activities, such as canoeing, kayaking, birding, nature and wildlife viewing.  Such attractions and activities demonstrate that the Study Reaches may be susceptible to use in interstate commerce.  Collectively, the above factors demonstrate that the Study Reaches are navigable-in-fact, and thus a TNW, susceptible to use in interstate commerce with recreational navigation activities.

60.     The Corps' decision to classify Study Reaches A and B as navigable-in-fact waterways was a "stand-alone" navigability determination, i.e., it was not associated with a jurisdictional determination for a particular parcel of land or an application by a landowner for a Clean Water Act permit, and affects the entire Santa Cruz River watershed.

61.     Colonel Magness made this decision because, in his words, "[w]e cannot determine jurisdiction [under the Clean Water Act] without first identifying the nearest downstream TNW."  Thus, the TNW Rule was considered necessary for the Corps to assert

jurisdiction over upstream tributaries of the Santa Cruz River under Justice Kennedy's "significant nexus" test.

62.     On June 30, 2008, the Assistant Secretary of the Army for Civil Works suspended the Corps' classification of Study Reaches A and B as navigable-in-fact waterways pending an internal review by senior officials in Corps Headquarters.  The Assistant Secretary initiated the suspension and review period in order to consider the validity of Colonel Magness' action.

63.     During the review period, Colonel Magness and his staff continued to stress the need to classify Study Reaches A and B as navigable-in-fact waterways for asserting jurisdiction over tributaries within the Santa Cruz River watershed under the Clean Water Act.  According to the Colonel, "without this TNW [traditional navigable water], the closest TNW may be the Colorado River, several hundred miles away.  Using the [Colorado River] as a basis for JDs would likely mean that we would lose most of our jurisdiction in the state."  The relationship between Study Reaches A and B and the Colorado River is depicted on Exhibit 3, attached hereto.

64.     Another Corps staff member explained in an e-mail communication to Headquarters on June 13, 2008 that unless the two study reaches were classified as traditional navigable waters – "TNWs" – the Corps would lose its ability to regulate much of the river's watershed:

> If these reaches are not TNWs, there would be a profound effect on our ability to regulate tributaries to the Santa Cruz River.  While the Santa Cruz would still likely be an RPW [relatively permanent water], the nearest TNW to the 8,600 square mile Santa Cruz River Watershed Basin would be 300 river miles away (the Colorado River) from the Pima County line.  An inability to find a significant nexus for these tributaries would lead to a wide loss of jurisdiction and ultimately pose serious water quality concerns for the area. [Email from M.Cohen to C. Smith dated June 13, 2008.]

65.     Another e-mail communication between Corps employees illustrates the use of the TNW Rule to assert jurisdiction over remote tributaries within the Santa Cruz River watershed.  In this communication, which is dated June 30, 2008, a Corps project manager explained to  a Corps attorney in the Los Angeles District that the TNW Rule will allow the Corps to regulate the development of a new copper mine located 30 miles southeast of Tucson, in the Santa Rita Mountains:

> On the other hand, [Pima] County has been wanting us to regulate Davidson Canyon which is a trib[utary] to Cienega Creek which becomes the Pantano Wash, trib[utary] to the Rillito River [sic], trib[utary] to the [Santa Cruz] River just downstream of where Reach B starts. … Augusta Mining wants to build the Rosemont Mine which would virtually destroy Davidson Canyon.  The County has come out quite vehemently as being opposed to it and wants to be a cooperating agency on the Forest Service EIS.  They feel our involvement will further their efforts to defeat this project. [E-mail from M. Blaine to T. Troxel dated June 30, 2008.]

Davidson Canyon Wash, Pantano Wash and Rillito Creek are ephemeral watercourses that transport water to the Santa Cruz River during and immediately after storm events.  These normally dry watercourses form a connected series of tributaries that reaches upstream from Study Reach B some 40 miles allowing the Corps to regulate a project in the Santa Rita Mountains.

66.     On August 17, 2008, and prior to the completion of review by Corps Headquarters, the EPA declared the Santa Cruz River a "special case" under the agencies' Geographic Jurisdiction Memorandum.  A special case is "a circumstance where EPA makes the final determination of the geographic jurisdictional scope of waters of the United States for purposes of section 404" of the CWA.  Geographic Jurisdiction Memorandum at 2.  "Case-specific determinations made pursuant to" the Memorandum are "binding on the Government"

and "represent the Government's position in any subsequent Federal action or litigation regarding the case." *Id.* at 2, 6.

67.    EPA Headquarters concluded its review on December 3, 2008, and affirmed the navigable-in-fact classifications for both study reaches.  EPA's decision, which was issued by Benjamin H. Grumbles, EPA's Assistant Administrator for Water, stated: "As a result of EPA's review of the District Determination and additional information available to EPA, I am affirming the Los Angeles District's determination that the two segments of the Santa Cruz River … are Traditional Navigable Waters (TNWs)."  A copy of that decision is attached as Exhibit 1.

68.    The EPA's decision also stated that the navigability determinations are to be immediately implemented by the agencies:

> I have asked EPA Region 9 to begin immediately to implement this decision and request that you also transmit this determination to the Los Angeles District so it may be used by the Corps to complete pending and future jurisdictional determinations for the Santa Cruz River watershed.

69.    The TNW Rule is final agency action within the meaning of 5 U.S.C. § 704.

70.    The TNW Rule marked the consummation of the Defendants' decision-making process regarding the navigability of Study Reaches A and B in the Santa Cruz River.

71.    The TNW Rule was intended to have immediate legal consequences by allowing the Corps and EPA to assert jurisdiction over desert washes and other ephemeral tributaries and drainages within the Santa Cruz River watershed under Justice Kennedy's "significant nexus" test.

72.    The TNW Rule is a "rule" within the meaning of 5 U.S.C. § 551(4).

73.    The TNW Rule is binding on the Corps and EPA and represents the agencies' final position in any subsequent federal action and any litigation concerning the status of Study Reaches A and B as traditional navigable waters under the Supreme Court's test for navigability.

74. The Corps is relying on and applying the TNW Rule in making site-specific jurisdictional determinations, issuing permits, and taking enforcement actions within the Santa Cruz River watershed under the Clean Water Act.

## CLAIMS FOR RELIEF

### Count One: The Agencies Violated the APA's Procedural Requirements

75. Home Builders incorporate by reference, as if fully set forth here, each and every allegation set forth herein.

76. The TNW Rule is a statement of general applicability and future effect that applies to all site-specific jurisdiction determinations, permit applications and enforcement proceedings throughout the 8,600-square-mile Santa Cruz River watershed, including the greater Tucson metropolitan area.

77. The TNW Rule carries the force of law. It is binding on the Corps and EPA and represents the agencies' final determination of the regulatory status of Study Reaches A and B of the Santa Cruz River as traditional navigable waters under the Clean Water Act.

78. Defendants adopted the TNW Rule and, upon information and belief, are implementing this rule in a manner that has regulatory effect.

79. The TNW Rule is a legislative rule under the APA.

80. Despite the TNW Rule's status as a rule, Defendants did not issue a general notice of proposed rulemaking in the Federal Register, including (a) a statement of the time, place, and nature of public rulemaking; (b) reference to the legal authority under which the rule is being proposed; and (c) either the terms or substance of the proposed rule or a description of the subjects and issues involved, as required by the APA.

81.     Defendants did not give interested persons, including Home Builders and their members, an opportunity to comment on the TNW Rule through submission of written data, views or arguments, as required by the APA.

82.     In the alternative, Home Builders allege that the decisions fixing the status of Study Reaches A and B of the Santa Cruz River as navigable-in-fact are adjudications subject to the requirements of 5 U.S.C. § 554 and/or to constitutional due process requirements.  These requirements were not satisfied because no notice was given to interested persons, nor were interested persons given the opportunity to participate in the decision-making process.

83.     Defendants' adoption and application of the TNW Rule without observance of the procedures required by the APA constitutes a violation of 5 U.S.C. § 553.  5 U.S.C. § 706(2)(D).

### Count Two: The TNW Determinations Are
### Arbitrary and Capricious or Otherwise Contrary to Law

84.     Home Builders incorporate by reference, as if fully set forth here, each and every allegation set forth herein.

85.     The Corps is authorized to issue permits for the discharge of dredged or fill material into navigable waters.  33 U.S.C. § 1344(a).

86.     The term "navigable waters" means "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

87.     Waters are *navigable-in-fact* if they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

88.     Waters are navigable waters *of the United States* when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which

commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

89.     Use of a waterway solely for water-borne recreation during exceptional, flashy flood waters is not sufficient to meet the definition of navigable-in-fact in its ordinary condition.

90.     Use of a waterway for birding, nature and wildlife viewing is not sufficient to meet the definition of navigable-in-fact in its ordinary condition.

91.     Use of a waterway which is dependent on discharges of sewage effluent from wastewater treatment plants for its base flow is not sufficient to meet the definition of navigable-in-fact in its ordinary condition.

92.     The TNW Rule is in conflict with established law regarding the criteria for determining when a watercourse is navigable-in-fact.

93.     The TNW Rule is unsupported by any legitimate evidence demonstrating that the Santa Cruz River, including Study Reaches A and B, is currently, or ever was, navigable-in-fact in its ordinary condition.

94.     The TNW Rule is unsupported by any legitimate evidence demonstrating that the Santa Cruz River, including Study Reaches A and B, is currently, or ever was in its ordinary condition, susceptible to use as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

95.     The TNW Rule is unsupported by any legitimate evidence demonstrating that the Santa Cruz River, including Study Reaches A and B, forms, in its ordinary condition, by itself or by uniting with other waters, a continuous highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

96.     In adopting the TNW Rule, Defendants failed to consider relevant information concerning the historic and current uses of and flows in the Santa Cruz River.

97.     The TNW Rule is in excess of the Defendants' statutory jurisdiction, authority, or limitations.  5 U.S.C. § 706(2)(C).

98.     The TNW Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

Home Builders pray for judgment from this Court as follows:

(A)     Declare that the Corps and the EPA violated the rulemaking requirements of the APA when they adopted the TNW Rule, and that the agencies' actions are, therefore, invalid and unlawful;

(B)     In the alternative to (A), declare that the Corps and the EPA violated the APA when they issued the TNW Rule without complying with the due process requirements applicable to adjudications, and that the agencies' actions are, therefore, invalid and unlawful;

(C)     Declare the TNW Rule to have been adopted without observance of the procedures required by law;

(D)     Declare the TNW Rule to be in excess of the agencies' statutory jurisdiction, authority, or limitations;

(E)     Declare the TNW Rule to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(F)     Vacate and set aside the TNW Rule in accordance with 5 U.S.C. § 706(2);

(G)     Award Home Builders their attorney's fees and costs of court as may be permitted by law; and

(H)     Grant such other and further relief as the Court deems just and proper.

Dated:  January 18, 2013.



Norman D. James (Ariz. Bar. No. 006901)
Todd C. Wiley (Ariz. Bar. No. 015358)
FENNEMORE CRAIG

 /s/   Felicia K. Watson          _____         3003 N. Central Ave., Suite 2600
Felicia K. Watson (D.C. Bar. No. 468492)    Phoenix, AZ  85012
Thomas J. Ward (D.C. Bar No. 453907)        Tel:  (602) 916-5346
Jeffrey B. Augello (D.C. Bar No. 496533)    Fax:  (602) 916-5546
NATIONAL  ASSOCIATION  OF  HOME             Email:  njames@fclaw.com
BUILDERS                                    Attorneys for Plaintiffs National
1201 15th Street, NW                        Association of Home Builders, Southern
Washington, D.C.  20005                     Arizona Home Builders Association and
Email: fwatson@nahb.org                     Home Builders Association of Central
       tward@nahb.org                       Arizona
        jaugello@nahb.org

7850536.4