UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
NATIONAL ASSOCIATION OF HOME                        )
BUILDERS *et al*.,                                  )
                                                    )
        Plaintiffs,                                 )
                                                    )
        v.                                          )   Civil Action No. 13-0078 (ESH)
                                                    )
UNITED STATES ENVIRONMENTAL                         )
PROTECTION AGENCY *et al*.,                         )
                                                    )
        Defendants.                                 )
_____)

## MEMORANDUM OPINION

The National Association of Home Builders and its member associations, Southern

Arizona Home Builders Association ("SAHBA") and Home Builders Association of Central

Arizona ("HBACA") (collectively "NAHB"), have filed suit on behalf of themselves and their

members, seeking judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§

701 *et seq*., of a determination by the U.S. Environmental Protection Agency ("EPA") and the

U.S. Army Corps of Engineers ("Corps") that portions of the Santa Cruz River are traditional

navigable waters ("TNWs") under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

Defendants move to dismiss for lack of subject matter jurisdiction or, in the alternative, for

failure to state a claim.  For the reasons stated below, the Court will grant defendants' motion.

## BACKGROUND[1]

Plaintiffs originally brought suit on March 23, 2009, alleging that the EPA and the Corps

_____

[1] The factual and statutory background was covered extensively in the district court and Court of
Appeals' opinions in the 2009 case, and need not be repeated here.  *See Nat'l Ass'n of Home
Builders v. EPA* ("*NAHB II*"), 667 F.3d 6 (D.C. Cir. 2011); *Nat'l Ass'n of Home Builders v. U.S.
EPA* ("*NAHB I*"), 731 F. Supp.2d 50 (D.D.C. 2010).

violated the APA in determining in 2008 that two reaches of the Santa Cruz River are TNWs.[2]

*See Nat'l Ass'n of Home Builders v. U.S. EPA ("NAHB I")*, 731 F. Supp.2d 50, 52-53 (D.D.C.

2010).  The district court dismissed the complaint on the grounds that the CWA precludes "pre-

enforcement review" of agency actions taken under its authority.  *Id.* at 55.  The Court wrote,

> the CWA precludes judicial review of a TNW determination until the EPA or the
> Corps decides to bring an enforcement action against a particular party, or the
> Corps issues an adverse permitting decision, at which time the aggrieved party
> will be able to challenge the basis for asserting federal jurisdiction over waters on
> its property, including the TNW determination underlying the assertion of that
> jurisdiction.

*Id.*[3]

The Court of Appeals affirmed the district court's dismissal on the alternative ground that

plaintiffs lacked Article III standing to challenge the TNW Determination.[4]  *See Nat'l Ass'n of*

*Home Builders v. EPA ("NAHB II")*, 667 F.3d 6, 10 n.5, 16 (D.C. Cir. 2011).  The Court of

Appeals held that NAHB had not demonstrated organizational standing "[b]ecause [it] has not

asserted the alleged violation 'perceptibly impaired' a non-abstract interest."  *Id.* at 12.  It also

held that NAHB had failed to demonstrate representational standing on behalf of its members

---

[2] On May 23, 2008, the Corps issued a memorandum, in which it stated that the two "[Santa Cruz] Reaches are navigable-in-fact, and thus a TNW, susceptible to use in interstate commerce associated with recreational navigation activities" and, as a result, "subject to the jurisdiction of Section 404 of the CWA."  (Compl., Ex. 1, May 23, 2008 Memorandum for the Record of Col. Thomas H. Magness, Dist. Dir., U.S. Army [ECF No. 1-2], at 5-6.)  On December 3, 2008, the EPA affirmed the Corps' designation, indicating that the EPA would "begin immediately to implement [the] decision" and instructing that it be transmitted "so it may be used by the Corps to complete pending and future jurisdictional determinations for the Santa Cruz River watershed."  (Compl., Ex. 2, Dec. 3, 2008 Letter from Benjamin H. Grumbles, Asst. Adm'r, EPA, to John Paul Woodley, Jr., Asst. Sec'y of the Army (Civil Works) [ECF No. 1-3], at 2.)

[3] The district court did not reach defendants' other arguments: that the TNW did not constitute final agency action, plaintiffs lacked Article III standing, and their claims were not ripe for review.  *See NAHB I*, 731 F. Supp.2d at 51 n.2.

[4] Accordingly, the Court of Appeals did not reach the issue of pre-enforcement review under the CWA or defendants' alternative arguments.  *See NAHB II*, 667 F.3d at 10 n.5, 16.

because "it has neither sufficiently alleged nor persuasively demonstrated any threat of injury in fact to any of its members that is 'fairly traceable' to the TNW Determination." *Id*. at 13. The Court explained that the TNW Determination only established that the two reaches of the Santa Cruz River could be subject to CWA jurisdiction, not whether any other particular "watercourse" is "jurisdictional and therefore subject to the CWA's permit requirements." *Id*. It held,

> Unless and until [an individual site-specific] jurisdictional determination applies the TNW Determination to particular property (and its watercourses) and finds a sufficient nexus – or the Agencies use the TNW Determination in an enforcement action against a party discharging without a permit – the owner or developer of the property suffers no incremental injury in fact from the TNW Determination and any challenge to it is therefore premature.

*Id*. The Court added "[i]n the meanwhile, [NAHB's] members face only the *possibility* of regulation, as they did before the TNW Determination: Any watercourse on their property may (or may not) turn out to be subject to CWA dredging permit requirements because of a nexus (or not) with the two Santa Cruz reaches." *Id*. (emphasis in original). The Court also indicated that "[w]ithout an additional allegation that the TNW substantially increased the risk of regulation or enforcement relating to particular property, we have no basis to conclude [that] the TNW caused a 'concrete and particularized' and 'actual or imminent' threat to any landowner, let alone any particular NAHB member." *Id*. at 14.

Finally, the Court held that NAHB's claim that it had "procedural standing to challenge the Agencies' failure to provide notice and an opportunity to submit comments pursuant to the APA" likewise failed because of the absence of an imminent injury-in-fact. *Id*. at 15. NAHB's petition for rehearing en banc was denied on March 8, 2012. *See id.* at 6.

NAHB has now filed a new suit, again challenging under the APA the procedural and substantive validity of the same TNW Determination at issue in *NAHB I* and *NAHB II*. (*See* Complaint [ECF No. 1] ("Compl.").) Defendants have moved to dismiss on the grounds that (1)

NAHB is precluded from relitigating its lack of standing; (2) NAHB still lacks organizational, representational, and procedural standing; (3) the TNW Determination is not "final agency action"; and (4) NAHB's claims are not ripe.  (*See* Defendants' Motion to Dismiss [ECF No. 12] ("Def. Mot.") at 2-4.)  In its opposition, NAHB asserts that it has "followed the guidance provided by the Court of Appeals and tailored its Complaint and supporting declarations to the *NAHB* [*II*] decision."  (Plaintiffs' Opposition [ECF No. 15] ("Pl. Opp.") at 27.)  It notes that it has specifically sought to address the "increased risk of regulation," "changes to the manner of regulation," and "types of watercourses on property of members now subject to regulation" resulting from the TNW Determination, based on the Court of Appeals' analysis of the shortcomings in its 2009 filings.  (*Id.*)  NAHB has also filed declarations from three association members who own land within the Santa Cruz River watershed and who claim injuries resulting from the TNW Determination.  (*See id.* at 1; Declaration of Albert LeCocq [ECF No. 16] ("LeCocq Decl."); Declaration of Larry Kreis [ECF No. 17] ("Kreis Decl."); Declaration of Jerry DeGrazia [ECF No. 18] ("DeGrazia Decl.").)

It is important to note that none of the facts on the ground have changed between 2009 and the present date.  The only difference is that in response to the motion to dismiss the 2009 case, NAHB submitted declarations from Thomas Ward, NAHB Vice President for Litigation and Legal Services, and Jessica Whyde, SAHBA President, whereas in response to the instant motion, it has submitted declarations from three NAHB and SAHBA members – Albert LeCocq, Larry Kreis, and Jerry DeGrazia – each of whom owns and seeks to develop land in proximity to the two Santa Cruz reaches.

NAHB's new litigation strategy is informed by the Court of Appeals' holding that the previous declarations "f[e]ll short of establishing certainly impending dangers for any particular

member of the petitioners' associations." *NAHB II*, 667 F.3d at 15 (quoting *Am. Chem. Council v. Dep't of Transp*., 468 F.3d 810, 819 (D.C. Cir. 2006)).  In particular, the Circuit Court highlighted Ward's statement, "I am personally aware of NAHB members that recently applied for and received authorization to discharge stormwater under CWA Section 402 in connection with construction activities on lands within the Santa Cruz River watershed and where the receiving water was identified as the Santa Cruz River."  (Def. Mot., Ex. 2, Feb. 3, 2010 Declaration of Thomas Ward, Vice President of Litigation and Legal Services for NAHB [ECF No. 12-2] ¶ 9.)   The Court found this statement inadequate because "the declarant fails to explain whether the TNW Determination motivated the landowner to seek an application for a permit or how the relief NAHB seeks – declaratory and injunctive relief – would remedy the *past* injuries the members may have already incurred in applying for the permits." *NAHB II*, 667 F.3d at 14 (emphasis in original).

The Court also highlighted Whyde's statement, "I have personal knowledge of at least one SAHBA member that owns land within the Santa Cruz River watershed and is applying for a Clean Water Act permit in connection with development activities on its land."  (Def. Mot., Ex. 3, Feb. 3, 2010 Declaration of Jessica D. Whyde, President of SAHBA [ECF No. 12-3] ¶ 11.) The Court faulted that declaration for failing to explain "why the member's decision to apply is directly traceable to the TNW Determination;" for saying "nothing about the property, the watercourse affected by the landowner's project or the greater likelihood of regulation, if any, after than before the TNW Determination;" and for failing to assert "that any member plans in fact to discharge contaminants into a likely jurisdictional watercourse anytime soon." *NAHB II*, 667 F.3d at 15.  Through the declarations from LeCocq, Kreis, and DeGrazia, NAHB now attempts to remedy the deficiencies identified by the Court of Appeals.  Although the

declarations fill some of the gaps, they still fail to satisfy the Court of Appeals' clear directive that standing will only be found when NAHB demonstrates that the TNW has been used as the basis for a site-specific jurisdictional determination ("JD") or enforcement action. *See id.* at 13.

## ANALYSIS

### I.   STANDARD OF REVIEW

#### A.   Rule 12(b)(1)

Plaintiffs bear the burden of establishing that the Court has jurisdiction over their claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Nonetheless, "[f]or purposes of ruling on a motion to dismiss for want of standing, [the court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "While the burden of production to establish standing is more relaxed at the pleading stage than at summary judgment, a plaintiff must nonetheless allege 'general factual allegations of injury resulting from the defendant's conduct' (notwithstanding 'the court presumes that general allegations embrace the specific facts that are necessary to support the claim')." *NAHB II*, 667 F.3d at 12 (internal citations omitted). Moreover, where a court's subject matter jurisdiction is called into question, the court may consider matters outside the pleadings to ensure that it has jurisdiction over the case. *See Teva Pharms., USA, Inc. v. U.S. Food & Drug Admin.*, 182 F.3d 1003, 1006 (D.C. Cir. 1999).

#### B.   Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), courts must first assume the veracity of all "well-pleaded factual allegations" contained in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681

(D.C. Cir. 2009).  Next, courts must determine whether the allegations "plausibly give rise to an entitlement to relief" by presenting "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" in that "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "In determining whether a complaint fails to state a claim, [courts] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [courts] may take judicial notice," *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), and documents "appended to [a] motion to dismiss and whose authenticity is not disputed" if they are "referred to in the complaint and are integral" to a plaintiff's claim.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (considering content of documents on motion to dismiss where complaint relied on documents' terms and where documents were subject to judicial notice).

## II.     NAHB'S STANDING

"[T]o establish constitutional standing, plaintiffs must satisfy three elements: (1) they must have suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) the injury must be 'fairly traceable to the challenged action of the defendant'; and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Where a plaintiff is seeking declaratory or injunctive relief, he "must show he is suffering an ongoing injury or faces an immediate threat of injury." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).

A.        **NAHB's Representational Standing**

"To establish representational standing, an association must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *NAHB II*, 667 F.3d at 12 (citations and internal quotation marks omitted).

NAHB fails to establish standing because it has not adequately alleged that any of its members have suffered an injury-in-fact fairly traceable to the TNW Determination and redressable by this Court.  The allegations in the 2013 complaint are not substantially different from those in its 2009 complaint, and the factual circumstances have not changed at all.  There is no suggestion that the TNW Determination has been altered since its issuance in 2008, nor that it has been superseded by any other agency statement.  Most significantly, the declarations filed by LeCocq, Kreis, and DeGrazia do not establish that the agencies have issued any individual site-specific "jurisdictional determination [that] applies the TNW Determination to particular property (and its watercourses) and finds a sufficient nexus – or . . .  use[d] the TNW Determination in an enforcement action against a party discharging without a permit." *NAHB II,* 667 F.3d at 13.  Nor do the declarants allege that they have been denied a permit or received a permit with undesirable conditions attached.  Thus, there is no suggestion that the agencies have taken any adverse action against NAHB or its members based on the TNW Determination.  The declarants also do not allege that the agencies have asserted CWA jurisdiction over any of their properties for the first time following the issuance of the TNW Determination.  On the contrary, the only Corps-issued jurisdictional determinations or delineations that the declarants identify are ones that predate the TNW Determination (*see, e.g.*, Kreis Decl. ¶¶ 20, 21 (Corps identified a

series of washes on Kreis' Cascada property as "waters of the United States" in 2004 and issued

a permit authorizing discharges of pollutants into those washes in February 2008); *Id.* ¶ 29

(Corps issued Approved Jurisdictional Delineation with respect to De Anza property in 2005)),

or ones that are "preliminary" and thus merely "advisory.[5] (*See, e.g.*, DeGrazia Decl. ¶¶ 23, 30,

35; Ex. C, DeGrazia Decl.)

Unable to claim the types of adverse agency actions that the Court of Appeals held are

necessary to establish injury, the declarants instead seize on other language in *NAHB II* and

attempt to demonstrate that "the TNW Determination substantially increased the risk of

regulation . . . relating to particular property." *NAHB II*, 667 F.3d at 14.  They argue that prior to

the 2008 TNW Determination, the nearest TNW was the Colorado River, which lies some 300

miles away from their properties, but now, because of the 2008 Determination, the nearest

TNWs are the two reaches of the Santa Cruz River, which lie within a few miles of their

properties.  (*See* Pl. Opp. at 7.)  This, they argue, "mak[es] it much more likely that drainage

features on our properties have a significant nexus to a navigable water body" (*id.*), which

creates the possibility of CWA regulation under *Rapanos v. United States*, 547 U.S. 715, 759

(2006).  NAHB claims that the declarations "identify four properties to which [the] TNW Rule

has been applied and seven properties that face an imminent threat of injury from application of

the TNW Rule, and explain the regulatory burdens and costs that affect those members'

development choices."  (Pl. Opp. at 28.)

---

[5] "Preliminary JDs are written indications that there may be waters of the United States on a
parcel or indications of the approximate location(s) of waters of the United States on a parcel.
Preliminary JDs are advisory in nature and may not be appealed."  33 C.F.R. § 331.2. "Approved
jurisdictional determination means a Corps document stating the presence or absence of waters
of the United States on a parcel or a written statement and map identifying the limits of waters of
the United States on a parcel.  Approved JDs are clearly designated appealable actions and will
include a basis of JD with the document."  *Id.*

In reality, the declarations do not identify properties to which the TNW Determination has been applied in the sense intended in by *NAHB II*.  Kreis discusses six properties that he owns and is developing or plans to develop with proximity to the Santa Cruz reaches.  Kreis describes obtaining a § 404 permit for his Cascada Project in February 2008, several months before the TNW Determination was issued, based on a 2004 jurisdictional delineation by the Corps identifying "a series of shallow, braided ephemeral washes as 'waters of the United States.'"[6]  (Kreis Decl. ¶ 20.)  Neither the jurisdictional delineation nor the permit was impacted by the TNW Determination that subsequently was issued.  Kreis states that in 2012, he decided to expand the project and filed an amended § 404 permit application "based on the proximity of the Cascada Project to Study Reach B."  (*Id.* ¶ 23.)  He asserts, "[h]ad Study Reach B not been classified as a TNW, we probably would have moved forward with development of the additional lands without filing an amended application because the minor, braided washes on the property would not have a significant nexus to the Colorado River or other TNW and were not in the flood plain."  (*Id.* ¶¶ 23, 24.)  That application is still pending, and Kreis does not claim that the agencies have taken any actions with respect to the Cascada property based on the TNW.

With respect to Kreis' De Anza Project, the Corps issued an Approved Jurisdictional Delineation in 2005 and Kreis applied in 2011 for "coverage under a Corps' § 404 nationwide permit to discharge fill materials into two washes *previously delineated* as 'waters of the United States.'"  (*Id.* ¶ 29 (emphasis added).)  The Corps granted the nationwide permit verification on March 30, 2012 and assessed an in-lieu-fee compensation of $3,630 "to compensate for the impact of filling the washes."  (*Id.* ¶ 30.)  Once again, the delineation was conducted before the TNW Determination was issued, and the § 404 permit was issued based on that delineation, so

---

[6] For clarity's sake, the Court notes that it appears this delineation was based on the Corps' pre-*Rapanos* understanding of its jurisdiction over "waters of the United States."

there is no causal connection between the TNW Determination and the permit verification (which in any case was granted) or the fees assessed.

Kreis concedes that his Sterling Meadows Project was designed in order to avoid jurisdictional washes but notes that "[a]s a result of designating Study Reach B as a TNW . . . we have concerns that there may be additional jurisdictional washes and drainage features on the property." (*Id*. ¶ 45.) These "concerns" are entirely speculative and meet neither *Lujan*'s standard for Article III injury nor the *NAHB II*'s requirement for establishing standing in this case.

Regarding Kreis' remaining properties – the Oasis Hills III Project, Talavera Project, and Copper Point Project – he discusses his intent to develop the properties and notes "because of the proximity of the washes to the Santa Cruz River, we anticipate that the Corps will assert jurisdiction over them, and we will be forced to apply for a § 404 permit." (*See id*. ¶¶ 34, 40, 47.) He also mentions the possibility of having to design around washes, the possibility of being subject to mitigation requirements and offset costs, and his definite intent to retain consultants to evaluate the washes. (*See id*. ¶¶ 36, 42, 49.) In each case, he states that the TNW Determination has made it "far more likely that the ephemeral drainage features on our properties will constitute 'waters of the United States,' subjecting our land use activities to regulation." (*Id*. ¶ 17.) But all of the consequences he mentions are possibilities only, not the "concrete and particularized" and "actual or imminent" injury required for standing, *Lujan*, 504 U.S. at 560-61, with the exception of his choice to retain consultants, which, while "concrete," is a "self-inflicted" injury that does not give rise to Article III standing. *Clapper v. Amnesty Int'l*, 133 S.Ct. 1138, 1152 (2013).

LeCocq's declaration is even more equivocal. He does not claim that the Corps or the EPA has asserted regulatory jurisdiction or applied the TNW to his Canyon Pass Property, but

rather, he concedes "[i]t is unclear whether the desert wash that crosses my property has a significant nexus to Study Reach B [of the Santa Cruz River]." (LeCocq Decl. ¶ 20.) He can say no more than that "the classification of Study Reach B as a navigable waterway certainly *increases the likelihood* that such a relationship exists and that the wash will be treated as a 'water of the United States' and be subject to regulation." (*Id.* (emphasis added).) He states further that he "will have to retain consultants to evaluate whether the desert wash that crosses my property is a 'water of the United States' . . .[and] [t]hat jurisdictional analysis would not be necessary absent designation of Study Reach B as a navigable water body." *Id.* ¶ 22. As with Kreis' similar representations, LeCocq's choice to retain consultants in anticipation of regulation that may or may not occur renders these expenditures "self-inflicted" injuries. *Clapper*, 133 S.Ct. at 1152. Taken to its logical extreme, the argument that these costs could confer standing means that even if the declarants' consultants informed them that there were no features on any of their properties that could possibly be considered jurisdictional, they would still have standing to challenge the TNW Determination because they had paid a consultant to find out that they are not affected by the Determination.

DeGrazia discusses his four properties – the Sabino Canyon Property, the Harrison Property, the Bonanza Property, and the Wilmot Property – and mentions the preparation of reports identifying washes on the properties as "potentially jurisdictional and subject to regulation." (*See* DeGrazia Decl. ¶¶ 22, 30, 38.) Notably, these are not jurisdictional determinations prepared by the Corps, but are private studies that DeGrazia commissioned. (*See id.*) In addition to those commissioned studies, the Corps did identify washes that are "potentially jurisdictional" on several of his properties, but DeGrazia does not identify any

adverse actions flowing from those tentative assessments.  (*Id.* ¶ 23.)  Quite the opposite, the Corps issued a permit with respect to his Sabino Canyon Property.  (*See id.* ¶ 24.)

These declarations fail to meet the criteria established by the Court of Appeals in *NAHB II*, for they do not establish that the agencies have issued site-specific jurisdictional determinations or undertaken enforcement actions by the agencies based on the TNW Determination.  Additionally, the mere possibility that the declarants might need to petition for permits with respect to certain of their properties – without even suggesting that a permit might be denied or granted with unfavorable conditions – is too speculative on its face to establish an injury in fact that is "fairly traceable" to the TNW Determination.

Furthermore, the declarants fail to demonstrate a "substantially increased risk of regulation," for, as defendants note, "[t]he[ir] argument rests on the mistaken and unsupported assumption that, in the absence of the TNW Determination, the Corps or EPA would necessarily regard the Colorado River as the nearest traditional navigable water to the Santa Cruz River watershed."  (Defendant's Reply [ECF No. 22] ("Def. Reply") at 8.)  However, as defendants explain, "[w]ith or without the TNW Determination, the Corps and EPA retain the discretion to examine, on a case-by-case basis, whether any water body, including the Santa Cruz River as a whole or its segments, is or was 'navigable in fact or . . . could reasonably be so made."  (*Id.* (quoting *Rapanos v. United States*, 547 U.S. 715, 759 (2006)).)  Indeed, as the Court of Appeals recognized, "[t]he Agencies decide through an individual site-specific 'jurisdictional determination' whether a particular watercourse in the Santa Cruz River watershed is within their CWA jurisdiction, using the jointly developed '*Rapanos* Guidance' document and based on the particular watercourse's nexus to waters the Agencies have determined to be TNW (in this case the Santa Cruz's two reaches)."  *NAHB II*, 667 F.3d at 13.  Thus, the TNW Determination –

which is, as NAHB recognizes, a "stand-alone" determination (Pl. Opp. at 11) – does not itself cause any injury.

In short, none of the declarations establishes the sort of adverse agency action that the Court of Appeals has indicated is necessary for a finding of injury in fact. Therefore, the Court finds that NAHB's allegations are still insufficient to establish representational standing within the meaning of *NAHB II*.

### B. NAHB's Organizational Standing

"To establish organizational standing, [an organization] . . . must demonstrate that it has suffered injury in fact, including such concrete and demonstrable injury to the organization's activities – with a consequent drain on the organization's resources – constituting more than simply a setback to the organization's abstract social interests." *Id.* NAHB's allegations with respect to its organizational standing remain deficient as it alleges little more than that it has "spent considerable staff time and monetary resources to clarify Clean Water Act jurisdiction for the benefit of its members," which echoes its allegations in the 2009 complaint.[7] In the absence of any additional allegations with respect to the organization's injuries, NAHB continues to fall short for the same reasons identified by the Court of Appeals – it has "not asserted the alleged violation 'perceptibly impaired' a non-abstract interest." *Id.*

### C. NAHB's Procedural Standing

To establish procedural standing, the plaintiff must show (1) "that the defendant's acts omitted some procedural requirement" and (2) "that it is substantially probable that the procedural breach will cause essential injury to the plaintiff's own interests." *Fla. Audubon Soc.*

---

[7] NAHB has added the notation that these expenditures were made "independent of this lawsuit" in an attempt to escape the Court of Appeals' characterization of these costs as "litigation expenses." *See NAHB II*, 667 F.3d at 12.

*v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996). NAHB asserts that it has procedural standing

based on the "specific, concrete injuries that the members are suffering or will suffer due to

Federal Defendants' procedural violation," – the failure to provide notice and an opportunity to

comment, as required by the APA, when they adopted the TNW Rule. (Pl. Opp. at 31.)

However, as discussed above, NAHB has not adequately alleged a specific, concrete injury fairly

traceable to the TNW Determination, and "deprivation of a procedural right without some

concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient

to create Article III standing." (*See supra* Section IIA.)

## III.   FINAL AGENCY ACTION

Even if NAHB could show that it has standing to challenge the TNW Determination, the

Court would still reject NAHB's claims because the Determination is not a final agency action

subject to judicial review under the APA. 5 U.S.C. § 704. "As a general matter, two conditions

must be satisfied for agency action to be 'final': First, the action must mark the consummation of

the agency's decisionmaking process—it must not be of a merely tentative or interlocutory

nature. And second, the action must be one by which rights or obligations have been determined,

or from which legal consequences will flow." *Holistic Candlers and Consumers Ass'n v. FDA*,

664 F.3d 940 (D.C. Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "In

other words, an agency action is final if, as the Supreme Court has said, it is 'definitive' and has

a 'direct and immediate . . . effect on the day-to-day business' of the party challenging it. *Nat'l*

*Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1278 (D.C. Cir. 2005)

(quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980)).

NAHB maintains that the TNW Determination is a final agency action because it was

issued pursuant to 33 C.F.R. § 320.1(a)(6), which provides that "formal determinations

concerning the applicability of the Clean Water Act . . . to activities or tracts of land . . . . shall

constitute a Corps final agency action."  NAHB also argues that the Determination is "final"

because it satisfies both prongs of the *Bennett* test.  (Pl. Opp. at 35.)  Under the first prong,

NAHB argues that the Determination is not "tentative or interlocutory" because EPA ordered

that it be implemented by its regional office and that it be communicated to the Corps "so it may

be used by the Corps to complete pending and future jurisdictional determinations for the Santa

Cruz River watershed."  (*Id.* (quoting Compl., Ex. 2, at 1, 2).)  Under the second prong, NAHB

argues that the Determination created a "binding norm" because it "fixed the nearest navigable

water body, thereby controlling the manner in which site-specific JDs are made for permitting

and enforcement decisions under the *Rapanos* significant nexus test."  (*Id.* at 35-36.)

　　　As an initial matter, the mention of "final agency action" in 33 C.F.R. § 320.1(a)(6) is not

dispositive.  First, the Corps indicated in rulemaking that the provision was added to clarify that

"when a district engineer makes certain determinations under these regulations, the public can

rely on that determination as a Corps final agency action."  51 Fed. Reg. 41,206, 41,207 (Nov.

13, 1986).  No mention was made of finality for the purposes of judicial review under the APA.

The Corps explained in later rulemaking that "jurisdictional determinations are not ripe for

review until a landowner who disagrees with a JD has gone through the permitting process" and

that "JDs are not necessarily 'final' even as an administrative matter [because] [p]hysical

circumstances can change over time, and the scope of regulatory jurisdiction when a JD is

initially performed might be different from the scope of jurisdiction when a permit application is

reviewed or when an enforcement action is taken."  65 Fed. Reg. 16, 486, 16,488 (Mar. 28,

2000).  While the Corps' comments addressed jurisdictional determinations rather than TNW

determinations, there is no meaningful distinction between the two in this context, as both

constitute "formal determinations concerning the applicability of the Clean Water Act." 33 C.F.R. § 320.1(a)(6).

Furthermore, courts have held that "[a]lthough [a] district engineer's assertion of jurisdiction may be 'final' agency action by virtue of 33 C.F.R. § 320.1(a)(6), this alone does not entitle the Plaintiff to pre-enforcement review." *Route 26 Land Dev. Ass'n v. U.S. Government*, 753 F. Supp. 532 (D.Del. 1990).[8] Rather, the question is whether the agency action satisfies the *Bennett* test as "the consummation of the agency's decisionmaking process" and "from which legal consequences flow." *See Hampton Venture No. One v. United States*, 768 F. Supp. 174, 175 (E.D. Va. 1991) ("notwithstanding the language of 33 C.F.R. § 320.1(a)(6) . . . . the assertion of jurisdiction by the Corps, without more, did not deny plaintiff the ability to carry out its plans. Therefore, the Corps' action at this juncture is not final agency action for which there is judicial review."). *See also Lotz Realty Co. v. United States*, 757 F. Supp. 692 (E.D. Va 1990) ("[§ 320.1(a)(6)] applies only when the determination at issue is by nature the final agency action *in a particular matter*[.]") (emphasis added).

Defendants do not contest that the TNW Determination meets *Bennett*'s first prong, but they maintain that the Determination is not final agency action under prong two because it does not determine legal rights or obligations, and there are no legal consequences that flow from it. (*See* Def. Mot. at 22.) This is an issue of first impression, for, as far as this Court can determine, no court has squarely addressed whether a TNW determination is a final agency action. However, a number of courts have held that a CWA jurisdictional determination is not a final

---

[8] Although the court relied in part on cases from the Fourth and Seventh Circuits that do not survive *Sackett* because they dealt with compliance orders, that does not undermine its conclusion that the statutory reference to "final" agency action does not amount to an authorization of judicial review under the APA. *See Route 26 Land Dev. Ass'n*, 753 F. Supp. at 539 (discussing *Southern Pines Associates by Goldmeier v. U.S.*, 912 F.2d 713, 715 (4th Cir. 1990), and *Hoffman Group, Inc. v. EPA*, 902 F.2d 567, 569 (7th Cir. 1990)).

agency action, based on reasoning that the Court finds persuasive here.  Like a property-specific

jurisdictional determination, a TNW determination "does not itself command [a party] to do or

forbear from anything; as a bare statement of the agency's opinion, it can be neither the subject

of immediate compliance nor of defiance."[9]  *Fairbanks North Star Borough v. U.S. Army Corps

of Engineers*, 543 F.3d 586, 594 (9th Cir. 2008).  Crucially, the Ninth Circuit highlighted, in

discussing a jurisdictional determination,

> At bottom, Fairbanks has an obligation to comply with the CWA.  If its property
> contains waters of the United States, then the CWA requires Fairbanks to obtain a
> Section 404 discharge permit; if its property does not contain those waters, then
> the CWA does not require Fairbanks to acquire that permit.  In either case,
> Fairbanks' legal obligations arise directly and solely from the CWA, and not from
> the Corps' issuance of an approved jurisdictional determination.

*Id*.  Similarly, in *Belle Co. v. U.S. Army Corps of Engineers*, the district court held that an

approved jurisdictional determination was not final agency action because it "'imposes no new

or additional legal obligations,' but simply 'reminds' Belle of existing duties under the CWA."

No. 12-247, 2013 WL 773730, at *3 (M.D. La. Feb. 28, 2013).  The TNW Determination holds a

similar status.  The Determination does not require NAHB members to take any specific action.

They either have obligations to seek permits under the CWA or they do not.  Those obligations

may have been clarified by the TNW Determination, but they do not arise out of the

Determination. And, as the Court of Appeals previously noted,

> Even before the TNW Determination, property owners and developers were
> aware the two Santa Cruz reaches could be so designated and other watercourses
> could, in turn, be considered CWA 'navigable waters' because of their nexus to
> the Santa Cruz reaches.  It was in part because of landowners' inquiries about
> their properties' jurisdictional status that the Corps undertook to perform the
> TNW Determination.

---

[9] If anything, a TNW Determination is even less "final" under prong two of *Bennett*, as
underscored by the EPA's statement that the TNW Determination "may be used by the Corps to
complete pending and future jurisdictional determinations for the Santa Cruz River watershed."
(*See* Compl., Ex. 2 at 2.)

*NAHB II*, 667 F.3d at 13-14.  Thus, the Court is not persuaded by NAHB's attempts to distinguish *Fairbanks* and *Belle*, and finds that the reasoning of those cases supports the conclusion that the TNW Determination is not final agency action within the meaning of the APA.

NAHB argues that other cases cited by defendants involve site-specific compliance orders and therefore have been overruled by the Supreme Court's recent decision in *Sackett v. EPA*, 132 S.Ct. 1367 (2012), in which it held that an administrative compliance order was final agency action and that the CWA did not preclude review.  (*See* Pl. Opp. at 39 (citing, *inter alia*, *Child v. United States*, 851 F. Supp. 1527 (D. Utah 1994); *Fiscella & Fiscella v. United States*, 717 F. Supp. 1143 (E.D. Va. 1989)).)  The Court agrees to the extent that the cases hold that compliance orders are not final agency actions.  However, the *Sackett* decision itself underscores the distinction between an agency action that is final – such as a compliance order – and one that is not – such as a jurisdictional determination or a TNW determination.  At issue in *Sackett* was an administrative compliance order issued under Section 309(a)(3) of the CWA.  33 U.S.C. § 1319(a)(3).  The order  "direct[ed] the Sacketts . . . immediately to undertake activities to restore the Site in accordance with an EPA-created Restoration Work Plan and to provide and/or obtain access to the Site and access to all records and documentation related to the conditions at the Site to EPA employees and/or their designated representatives."  *Sackett*, 132 S.Ct. at 1371 (citations, internal quotation marks, and brackets omitted).  The order "expose[d] the Sacketts to double penalties in a future enforcement proceeding" and "severely limit[ed] the Sacketts' ability to obtain a permit for their fill from the Army Corps of Engineers."  *Id*. at 1372.

By contrast, the TNW Determination does not require NAHB members to do anything, nor does it expose them to additional penalties in a future enforcement proceeding, or impact

their ability to obtain a permit from the Corps.  The TNW Determination, at most, warns developers in the Santa Cruz watershed that they may be required to obtain a permit for certain activities in certain locations in order to be in compliance with the CWA.  This is not enough, for agency actions that merely warn regulated entities are not considered to be final agency actions, as they do not "determin[e] rights or obligations" nor do "legal consequences flow" from them. *Holistic Candlers*, 664 F.3d at 945.  There is nothing legally binding about them.  *See Belle Co.*, 2013 WL 773730, at *3 (distinguishing site-specific jurisdictional determination from compliance order at issue in *Sackett*).

NAHB members' options remain the same now as they were prior to the TNW Determination.  "First, a potential discharger can apply for a permit," and "[i]f its application is denied (or granted with unacceptable conditions), the applicant can appeal administratively and then seek judicial review of that permit decision under the APA."  (Def. Mot. at 26.)  If the TNW Determination was used to assist in assessing the permit decision, it will be part of the administrative record and can be challenged at that time.  (*See id*.)  Or, "if a potential discharger upstream of the reach which is the subject matter of the TNW Determination does not agree with it, the potential discharger can proceed to discharge without applying for a permit."  (*Id*.)  And, the Corps or the EPA can pursue an enforcement action, just as they could prior to the TNW Determination.  (*Id*. at 27.)  As the D.C. Circuit has previously held,

> if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purposes of judicial review. Thus . . . [p]ractical consequences, such as the threat of having to defend itself in an administrative hearing should the agency actually decide to pursue enforcement, are insufficient to bring an agency's conduct under our purview.

*Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) (citation and internal quotation marks omitted).

Here, NAHB members face no "certain change in the[ir] legal obligations" as a result of the 2008 TNW Determination, and any potential consequences that they could face are insufficient to transform the Determination into final agency action.  (*Id.*)  In the absence of a final agency action, the TNW Determination is not subject to judicial review under the APA, and NAHB has failed to state a claim upon which relief can be granted.[10]

## CONCLUSION

For the reasons stated above, the Court will grant defendants' Motion to Dismiss.[11]  All other motions are denied as moot.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  July 26, 2013

---

[10] Because the Court decides the case on the basis of standing and final agency action, the Court declines to reach the issues of ripeness or issue preclusion.  (*See* Def. Mot. at 27-29.)

[11] In the concluding sentence of its opposition, NAHB makes a vague reference to obtaining, as an alternative, leave to amend its complaint "to address any deficiencies under Fed. R. Civ. P. 15(a)."  This request fails to satisfy the requirements of Fed. R. Civ. P. 15(a) and Local Rule 15.1.  *See Rollins v. Wackenhut Servs.*, 703 F.3d 122, 131 (D.C. Cir. 2012)  ("[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a). D.C. District Court Local Civil Rule 15.1 requires a motion for leave to amend to include a proposed amended complaint.") (citation and internal quotation marks omitted).  Moreover, amendment would be futile because there has been no final agency action.